Ms. McComas May it please the court, we represent the appellant, Leggett & Platt & Simmons Betting Company. This case comes to the court from a summary judgment of no invalidity and infringement after claim construction, followed by an 8-hour trial on damages. Our brief identifies a lot of issues, including written description and claim construction, and a lot of procedural errors that occurred below. But today we'd really like to focus the court on three issues. First, we'd like to give a brief update on what's happened in the PTO and how that could impact this court's decision. Second, we'd really like to focus on invalidity and obviousness. And third, damages. And we'd like to talk about how IMAGINAL's damage theory was just that, a baseless theory unfounded by fact that cannot stand. Just quickly, we filed a Rule 28J letter with the court about a week ago that identified some recent developments in the PTO that the Claim 1 of 546, which is one of the three claims at issue in this appeal, is near finality and is going to be invalid. Is that a part of this record at all? It is. We raised the original proceeding in the record below at that point, but the current proceeding is not. The reason we raised it with the court is because that has been trailing in the court and we've been letting the court know about the status and we felt obligated. Let's take a look at it, shall we? I don't think this is very relevant to... We're reviewing a decision of a district court. What's happening in an administrative proceeding doesn't seem to me to be directly relevant. I agree with you unless it goes to finality, in which case you have a final decision in validating the patent and that will impact the damages in this case. That's the only reason we raised it. And just to be clear, the reason it impacts the damages is because Claim 1 of the 546... Is that in this record? Claim 1 of the 546 that it came two years before the others is. I understand the claims are, but what's happening in an unrelated administrative proceeding, how is that... Just stick with our record. Got it. In validity, the court can get to the same place that the PTO did without worrying about the PTO. And it's not hard to understand how they got there. With the exception of the 402 patent being a method patent and the 454 patent employing a censor, and I'll address those distinctions in a minute, it's undisputed here that DERCOS 789 is the same invention as the current invention with one exception. DERCOS used a vision guidance. DERCOS 789 used a vision guidance system. The current invention uses a mechanical guide. And the mechanical guide existed throughout the prior art. We show this in detail. We gave the court a claim chart in our brief at pages 42 to 57. But I want to highlight a few specific references. One of those is NOS. NOS closes the mechanical guide along with all the other limitations of the 546 patent. And those can be found... The base is at column 3, lines 13 through 21. The stapler and fastening tool is at figure 1 and column 3, lines 25 through 27. The drive mechanism is at column 3, lines 50 through 58. And the mechanical guide is at figures 5 and 6. Columns 6, 30 through 34, and column 6, 63 through column 7, 2. You're talking about NOS. NOS. That's NOS. Was that considered by the trial court? It was in the briefing. Was it considered by the trial court? Are we reviewing NOS? You should. Is it part of the decision which we are reviewing? This is a review of a summary judgment which is reviewed de novo. And it's in our motion for summary judgment. It is evidence that supports the summary judgment on invalidity. And it was also raised in response to Imaginal's motion for summary judgment. So, yes, I do believe it's before you and it should be considered. Counsel, it wasn't... I mean, did NOS have both a mechanical guide for horizontal alignment and the automatic alignment of the stapler and the module? Did it have both? It didn't have horizontal alignment, but there's no requirement in the court's claim construction that there be horizontal alignment, just that there be alignment. I know Imaginal makes that argument, but there's nothing to support it in the claims construction. That goes beyond what the court construed. Now, Beavers also has a module alignment device that moves relative to the module. Beavers looks like an industrial handheld stapler. That's at figure 8 on page 46 of our opening brief. And it discloses as the stapler moves along the line, the groove 36 aligns the wire with the bottom of the stapler. Legas experts said that the Beavers device, when used with the wire module of the 546 patent, would inherently move the wires into position or guide the tool if the wire was initially placed to the left, right, or into the center of the V-shaped guide, causing relative movement between the stapler and the subject wire module. And he also noted that the Beavers guide was specially adapted so that it could be attached to existing staples. And then there's Landris. Landris, there's a picture of it on page 38 of the Appelese brief, which shows a cross-section of the stapler and reveals that if it's hit off-center, it's going to move to align itself. And that's what Legas experts said, but so did Imaginal's experts. Dr. Pratt said, he was asked about Landris, he said, we said, Dr. Pratt, isn't it correct that if this foot depicted in Figure 2 hits a portion of the steel wire sitting on wood, that it would make the steel wire into the capture range of the feet some percentage of the time? His answer, some percentage of the time, yes. Let's look at what the district court said on that. They said, the mechanical guides in the prior art do not position themselves based on where the article is located. Moreover, the prior art require manual movement of the entire tool to achieve proper alignment if initially misaligned. And then he goes on to point out that that's not the claimed invention. He's distinguishing the prior art. What is error in that? He's wrong. The prior art clearly has a module alignment device that moves relative to the module consistent with its claimed construction. That's why I'm pointing out these specific references. In the face of these prior art references, what Imaginal really argues is the difference between those prior art references that I just mentioned, other than not actually, is that they're not automated. But this court held in Simline that automation of mechanical equipment once operated manually is commonplace and reasonably obvious. Counsel, I sort of feel like I'm back in the trial court, that you're sort of arguing this. Can you tell me really where you think the trial judge missed it? I mean, I just feel like you're repeating your argument in the trial court, but the trial judge heard all of this and everything. Can you tell me where you think he was specifically in error? I struggle a little bit with he heard everything because there's kind of a bizarre procedural. This was summary judgment. There were cross motions filed. In his original order, he said, I'm going to look only at Leggett's motion for summary judgment because they have the burden. So he didn't look at all the evidence in the cross motion yet he granted for them. So I'm not sure he heard everything or analyzed everything. Where he missed it is he construed the claim as, hang on, I've got to have this in front of me or I'm going to say it wrong. He construed mechanical guide as a component that directs the stapler and module into alignment. These prior art references do that. They're not automated except for Knopf. Knopf is both automated and has mechanical guide. But these prior art references do that. What's different about them is that they are not automated. But Dirkhoff 789 is. And when you look at what's out there in the prior art, I don't know exactly where he missed it, but he missed it. If you put these prior art references together in a simple fashion and look at, they have the mechanical guide and they're automated. Or there's a motivation to automate between them. Well, in the first place, both Beavers and Landris are in this handheld stapler art. Why would one combine the handheld stapler art with the fully automated art? Well, that's what Finline said, that when there's a manual automation and mechanical equipment once operated manually is commonplace and reasonably obvious. And I think that's right. And I think that's what the experts said too. Dr. Pratt got there. So did Leggett's expert. Now, there is one other thing. The judge didn't consider the expert evidence put in. He didn't consider our expert's report. He dismissed it. No, it was in the summary judgment evidence. He dismissed it as conclusory. He just said all he does is go through. But I submit to you, if you go look at that report, it does what every expert does. It lays out very carefully the evidence. It lays out very carefully the prior art and then he draws his conclusions based on that prior art. I would like to hear from you about the damages aspect. But before you do, before you leave the obviousness, are you asking this court to reverse and render judgment or are you asking it to reverse and remand for a trial of the fact issue? I think we would like... There were cross motions. We did move on these grounds. We think the court can reverse and render based on the Finline case and some of the other cases that have come out recently. Alternatively, there's at least the fact issue here that would require a remand. Would you comment on the damages? Absolutely. So I want to move on to damages, and there's a lot here and I'm already into my rebuttal time, so I'll try to hit it as quickly as I can. Imaginal asked for $15 million in damages. The jury awarded $5 million. There was no evidence to support $5 million any more than there was for $15 million. In fact, even though Imaginal called Dr. Modi, that was their damages expert, to testify on damages, none of her testimony should be credited. Let me show you why. Dr. Modi's testimony was based on a failed business plan. Her entire premise was based on a plan that Imaginal had put up, shopped in the market, and it wouldn't work. That was put together back when it was trying to sell its own product, the Autosafe, for $2,000. There was no evidence that this business plan could form a hypothetical negotiation between a willing licensor and willing licensee for purposes of arriving at a reasonable royalty. Under that plan, Imaginal tried to convince the market to license its product on a per-hit pricing formula. The evidence is undisputed. A per-hit pricing formula is not what anyone in the market will pay. Dr. Modi noted that Topoff was underpricing its equipment in order to recover more in the staple sales market, and therefore that justified the additional value rendered by the district court. What's incorrect about that? What's interesting is she may have noted that fact that's not her calculation. In the time I have left, I'm not going to be able to walk you through it, but there is a chart. It's at A7681, and that is basically her damages calculation. If you'll see, the way I've come to think about it is zero times any number is still zero. Her calculations are based on multiple improper facts. We all should walk you through this in the brief, but if you use that chart to look at it, it'll help you understand. Everything is based on a per-hit fee, and I'm going to run out of time and not have any time for rebuttal, but I want to go through at least one thing here. They rely heavily on Home Depot versus Powell. Home Depot versus Powell analyzed cost savings, but even in that case, and I'm not conceding that applies here based on the evidence, which none of her calculations were based on real evidence, but, and if I have time on rebuttal, I'll show you some of that, but Home Depot versus Powell, the ultimate damage award that was made was a per-unit damage award, and it was paid-up license. Here, you're getting a per-hit per-staple ad infinitum under Dr. Modi's theory in a market where it is proven that is not the way they do business, and in Home Depot, you didn't have that evidence. Thank you. I'll save a few minutes for rebuttal. Thank you, Ms. McComas. We'll restore Ms. McComas's five minutes for rebuttal, and if you'll give Mr. Hanl an additional four minutes, that'll keep us even. If you need to use that, you may. You may proceed. Thank you. Good morning, Your Honors. Steve Hanley for the athlete imaginal. Excuse me. I think I mispronounced. That's quite all right, Your Honor. For the athlete imaginal systematic LLC and my colleague, Ryan Lindsay. May it please the Court. First, I'd like to address a couple of the questions that the panel asked during the appellant's argument. Answering Chief Judge Rader's question about whether NOTH is before the Court, it is, in fact, not appropriately before the Court, and the reason it's not before the Court is because the reason it was argued in this appeal as being relevant was in support of an anticipation theory. It is not offered in support of an obviousness theory. If you go back and look at the defenses that were raised below in opposition to imaginal's motion for summary judgment, the appellant did not raise anticipation. So, NOTH is now raised in support of an anticipation theory that was never raised below. So, the Court's authority is very clear that when an argument... Our Court has said on a couple of occasions that anticipation is kind of the ultimate test for obviousness. If we looked at this very broadly, could we consider NOTH as part of the obviousness contention? I don't think so. I think that for two reasons. One is that there was a single sentence on NOTH in the NOTH reference in the opposition to imaginal's motion for summary judgment, and it was solely addressed in the mechanical guide element. It didn't address all the other elements, and so there was no evidence from which you could glean an ultimate obviousness argument from the minuscule reference to NOTH in the record. The second reason is there was really no fair notice of that defense, which would have caused imaginal to distinguish further NOTH from the claim to invention. Specifically, NOTH does not disclose a module as that claim term is defined in the patent. The patent very clearly defines modules as conventional support modules, and there's no argument that a lattice piece is a conventional support module. So it would be quite unfair to allow appellants to raise this anticipation argument now that would have brought to bear additional issues such as claim construction below that imaginal didn't have the opportunity to argue. So I would reassert that NOTH is not relevant to this appeal because it was not properly placed before the district court. The second point I would like to address, Ms. McComas quoted some trial testimony from Dr. Pratt from the trial of the willfulness phase of the case. That testimony was not before the court on summary judgment, so that also is not appropriately considered by the court in connection with its review of the court's decision on invalidity. Chief Judge Rader also asked why the court would look to manual staple art to automate, and in fact, the short answer is one wouldn't. The art in the case was agreed to, and it was machines or methods for automating manufacturing processes, including fastening parts to other parts. I mentioned automation twice. It is undisputed that Landris and Beavers, which are the references relied on to provide the mechanical guide, are manual staplers from the construction industry and have nothing to do with that. But they're staplers that help you align the staples. Why wouldn't I look at that if I'm in the stapling art, looking at it a little more broadly than just the automated stapling art? Why wouldn't I consider it? I guess, first of all, the art was not defined as the stapling art. It was defined as the automation art. So that's the first answer. The second answer is, and this is as found by the district court, the Landris and Beavers do not disclose how one would align a stapler and a module automatically, and nor does Dr. Sturges' testimony explain that other than merely stating that conclusion. So here you have not only a problem with using non-analogous art, but it's not directed to the problem to be solved by the patented invention. The problem to be solved by the patented invention is you have 100 staple points on a base here, and you need to repeatedly, unless you have 100 staples, you need to repeatedly align and realign and realign the staplers with the module. So you need a mechanical guide that's capable of engaging to align the stapler and the module to disengage and then to realign and to do it automatically. Beavers, for example, teaches a guiding and gripping means in which the flexible wire is strung into this means, and the purpose of it is to impart friction on the wire. So as you're sliding that stapler along a stud, you're pulling that line taut and removing the friction, or with friction you're removing the slack out of that wire, so you're freeing up the left hand of the human operator from pulling that line taut. And to disengage that line from that guiding and gripping means so that it could be used to realign the stapler with a plurality of modules is taught away from by the purposes of that beaver's device. Similarly, Landris, there is absolutely no teaching in Landris of using the compressible foot to guide or align anything. The purpose of the compressible foot in beavers is to control the drive depth of the staple. So the operator takes the stapler, tries to miss, tries to get the feet to miss the wire and straddle the wire and then press it down. The compressible foot compresses into the device and allows multiple pulls of the trigger to control the drive depth of the staple without damaging the plastic sheath around the electrical wire. That is the express purpose of the Landris device and there is no disclosure of using that compressible foot as a guide to align anything. Can we move to damages a minute? We're talking about a machine, right? We are. And somehow we get off into talking not about profits on machines, but we're talking about royalties on cost savings and that number becomes a little detached from the machine itself. How can this be an accurate assessment of the infringement value here? Your Honor, this is actually an unusual case in that we have direct evidence of the value of the patented invention, unlike any case I can think of. In a typical case, you'd be looking at, for example, the price of the box spring, which is $117, is one of the prices that was given by the appellant's evidence. And under a traditional analysis, you would try to coax out the value of the patented invention somewhere out of that $117. In this case, we have direct evidence of the value of the patented invention in terms of labor cost savings. The evidence is that every party in the case, Imaginal as the patent owner, Simmons as the user, Leggett as the seller of the machine, valued the patented invention by the labor cost savings. And when they calculated the labor cost savings, they did it on a per-use basis because every time a grid runs through that machine, you're achieving, in Simmons' case, $1.28 in labor cost savings. So we have direct evidence, in this case, of the value of the patented invention. Is that $1.28 per stapler? It's $1.28 per wire grid, the wire grid being it's 100 staples roughly because you have a wire grid with 100 staple points. So had not Leggett tried for a number of years to sell, license the patented invention on that basis and had no takers? You may have misspoke here. You said Leggett. Imaginal attempted to license a vision-guided machine, which is sort of a previous earlier attempt, a failed attempt, frankly, at achieving this. And so there were unsuccessful attempts to license that vision-guided machine once the mechanically-guided machine, which was a lot more efficient and less bulky than the vision-guided machine, was put into the market it took off and was very successful. And what's interesting is that Leggett is in the business of manufacturing machines, but they also sell the components that run through the machines. And so the evidence in the case was that Leggett sold the machines at little or no profit because it used the sale of the machines to secure the sales of the semiflex wire grids that went through the machines upon which it made millions of dollars. And that evidence was undisputed. But the jury arrived at a number that no one really proposed. Kind of shot in the middle of something. This is... Help me understand how that's supported by the record evidence. Certainly. All that is required is that the jury's award not be so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty. And another way, I think, that this Court has said the same thing is it needs to be within the range of the evidence presented by the parties. Here, it was very clearly within that range. But also, I believe there's some logic to it. And, you know, we don't... This Court, as long as the award is supported by substantial evidence, it's not this Court's job to look behind what the jury did and try to figure it out. But here, I think there's some pretty good indication that the jury's award was based on labor cost savings. And I say that because the only theory of damages presented against Simmons was the labor cost savings that it achieved from the sale of the machine. So the jury apportioned $3 million of the $5 million of damages to the labor cost savings achieved by Simmons. So the evidence established that Simmons recognized $8.7 million of labor cost savings from the use of the patented invention. That's 6.8 million grids times $1.28 per grid. Here's my problem. You are taking the value of the entire machine and everything that it does as your labor cost savings. That isn't the patented invention. The patented invention is mechanical alignment of that machine. We've had automatic machines in the market for, I'm sure, decades. And that isn't your... You're limited to your claimed invention, which is the mechanical alignment. How can you tie labor cost savings on the entire machine to the mechanical alignment feature, which is all you're entitled to here? I respectfully disagree with the contention that we're only entitled to the value of the mechanical guide because the invention is, in fact, the collection of all the elements. There's a base. There's a drive mechanism. There's controllers. There's sensors. Yes, but what you contributed to the art with this invention was your mechanical alignment. Now, you could have claimed... expanded your claim to add ways of improving bedding and perhaps incorporated a dozen more machines. The way you fashioned this claim to incorporate elements that are not part of the advance is irrelevant, isn't it? I would, again, disagree, but... Why would you disagree with it? It's pretty clear in our law that you're entitled to compensation on what you've contributed to the art, not on how broadly you've claimed your invention as part of that small advance. Well, two parts, I guess. The first is the statute. The court shall award the claimant damages adequate to compensate for the infringement. And the infringement is of the claimed invention and what the claimed invention has added to the art is a mechanical alignment, not the entire automation industry. Well, I've not seen... You're taking damages for automation. You didn't invent automation. That goes back to Henry Ford and those guys. Well, I've not seen a decision by this court where it has parsed a damages award that finely. However, I... To the contrary. I think time and time again we've made it very clear you get the claimed invention and what you've added to the art. As to... Then let me address that point. What was added to the art in the form of a mechanical guide allowed automation. Leggett was in the business of automating manufacturing equipment. The Semiflex grid, which this machine staples, was around since 1991, and Leggett had never come up with a machine that allowed the automation of the process of stapling the box springs to the frame. And when... And once they infringed and used the machine with the mechanical guide, that's when... That's what permitted automation. So before the invention, automation couldn't happen because no one could figure out a way to cheaply and inexpensively get the staple heads down to 100 staple points in an efficient and reliable way. You're saying the mechanical alignment allowed the automation. Absolutely. And it was actually quite ingenious. And you did not have automation prior to that. That's right. What about the camera before? Failed. Didn't work. It was economically... It was cool, but it was economically useless because it was slow, and it was not reliable. As you can imagine, vision guidance and how complicated that is was simply... How about the modules? How were they attached prior to the invention? Manually? Manually. There's a picture on the first page of our brief of a guy standing there with a 3-foot-long stapler that had to do it over 100 times because it was manual. They missed. So actually it was about 110, 120 times. For every single wire grid, had to do it manually. And really, the invention was sort of counterintuitive and sort of ingenious because he went from high-tech vision guidance to low-tech mechanical guide, but that move, that counterintuitive move to a lower tech is what allowed the automation. And before this, it just wasn't there. So... And evidence was presented as to the cost savings between automation and manual operation. Absolutely the most detailed and reliable evidence you can think of. The evidence from Simmons itself did two analyses of labor cost savings in the year that the infringement started and calculated to the cents what the labor cost savings were per grid, and that was $1.28 for wired grid. So calculating the value of this automation was very simple. It's simply a matter of multiplying the number of units run through the machine times the labor cost savings per grid. As to the rest of Dr. Modi's analysis, it was simply a matter of now apportioning the value of the patented invention in terms of labor cost savings as between the infringers and as between Imaginal. Her proposed division was 48% for Imaginal, 52% for the defendants. The jury's award was something like 30% for Imaginal and 70% for the defendants. So her damage calculation, the value of the patented invention was well supported by substantial evidence, better than any case I can think of, and the apportionment was also supported by substantial evidence because she considered the Georgia-Pacific factors, she considered where Imaginal would want to start in the hypothetical negotiation based on its business plan, she considered what adjustments might be made to that starting point based on the interests of the infringers, and came up with an apportionment, and the jury awarded something less than she proposed, but certainly an award that was supported by that substantial evidence. Just circling back to the obviousness issue for a moment, this is a classic case of hindsight. This is where the appellants had used the invention to define the problem to be solved and then selectively called elements from non-analogous art to try and solve the problem. It's very close to the Mintz case, which Chief Judge Rader recently wrote, in the Meat Encasement Arts, where somebody was looking to unrelated art of knitting based on a hindsight view of the problem to be solved. So one would only have known to go look for mechanical guides based on using the Durko's invention as a roadmap, and this court has repeatedly precluded such a hindsight view of an obviousness determination. I think there's certainly... The appellants have argued that Dr. Modi's analysis should be excluded. That's an abusive discretion standard. It's a very high standard, and it's certainly... There is no abusive discretion here, so we believe that argument is unsupported. I believe there is an issue in addition to this issue of hindsight. There's an analogous art issue that I've alluded to that based on the agreed-to definition of the prior art is automating manufacturing processes. The Beavers and Landers references that are relied on are from non-analogous art, so the court's decision was correct. It was supported by the evidence or lack of evidence, and the jury's award was also supported by this example. Thank you, Mr. Hanley. Ms. McComas, you have five minutes. Thank you, Your Honor. Can I take you right to where Mr. Hanley and I were talking? Sure. It's true that he didn't invent automation, but didn't his small contribution to this art enable the automation, which really did save all this labor cost? Why isn't he fully entitled to this damages award? Our issue isn't with what they invented. The issue is with the damages they presented, and I think I have to deflate the idea that this damage model is based entirely on cost savings. That's the problem. It's not. There's testimony about cost savings, and that that analysis was used to determine... So that's not a problem. You'll accept that as the model? That the automation... Their little, their tiny contribution to the art enabled the automation. They deserved the cost savings that came from that automation, therefore. No, I mean, yes and no. I think the premise is right. The problem is with the facts here. Doesn't the record support everything that Mr. Hanley just said? No, and that's where I'm headed. What's missing? A lot of things, and I'm going to start with the cost savings. What evidence other than the cost savings, then, do you say were improper in arriving at the hypothetical negotiation? Thank you for getting me there. Going back to the chart, and this is the basis of... If I can open this and hold it up. I'm sorry it's annotated because we had to go through the evidence and find it. This was at A7681. This is what we cross-examined Dr. Mone on. She actually updated this when she was examined directly, but this gives you the foundations. This was the premise for her numbers. The premise for her numbers is not the actual cost savings. And let me back up one more because this is going to go to it as well. There are a lot of problems with cost savings. Some of them are just with the math, with the way she applied it. But there are also problems with the concept because in this... Can you bring that up for us? Sure. Where did you say that this is located? 7681. 7681. I believe, 7681. That's the chart. There are 10 columns. 7681. 7681. I'm sorry. We're looking at it here. There are 10 columns there. And those columns, if you'll see, I think it's the second or third because you have my copy now, is HIT-C. Do you see that? Yes. There's a HIT-C column. That comes from their failed business plan. And that is the multiplier Dr. Mone uses to get to her damage calculation. So she takes the HIT fee that Imaginal wanted to get from the cell of the DERCO 789. It's the fourth column. I'm sorry. See HIT-Use fee? We see it. Okay. There are several problems with that one because with the HIT-Use fee, the evidence is nobody paid a per HIT per use fee in this market. That's undisputed. Okay? And this number here is from their failed business plan, which absolutely everyone refused to pay. That is the first step in her calculation. Did you object to the introduction of that evidence? Yes. We actually filed a motion in limine seeking to exclude Dr. Mone's testimony entirely because it's based on funny mouth and unfounded evidence. And what's the error in using if the number of HITs is the way you're Why is this an error? For multiple reasons. One is this number is speculative because it's based on something that never came to fruition. But more importantly, this is like the Stickle versus Huline case where the market would have never paid a per HIT fee. So to use this as the foundation, let me go back because there are two problems with cost savings. I'm trying to figure this out. I've got five men who have to run up and down with a staple gun and attach this thing and I've saved their labor costs because I can mechanically align it now. Why can't I calculate that on a HIT by HIT basis? Because nobody would pay it. They would say it's not worth it to me because what they said in the market, the only evidence in this record, is that this market, when they take into account, is this going to save me money? They do consider that. But they don't consider that in saying, so would I pay a per, I forget, okay, .009 cents for every staple HIT? Absolutely not because I want to recoup my costs on a piece of manufacturing equipment in two years. Did you introduce evidence in support of your argument? Yes. That's the only evidence in the record as to what the market would do. Counsel, you say that the HIT use fee should not be included in this chart and there are a lot of other factors that are in. Why should we not conclude that the jury took that into account because they did discount the damages? They may have believed that part of your case. Well, because you can't, none of these calculations work because they're, she does a lot of funny math that gets you to all multiplied by that HIT use fee. But the industry uses a per foundation basis, all right, rather than a per HIT. But it's still a use fee and it's still the savings on that use that you've conceded is supported by this record. Why should we get into the details of this? The jury did that work. They go, the jury wasn't allowed to do that work because they were, they walked through a formula with Dr. Mody that was founded on a bunch of. And they made the findings. But they, look, they reached $5 million. There's no evidence to support that number. The only evidence in this record, and the court hasn't said in its opinion that the range is anywhere from what the defendant testifies to to what the plaintiff, has to be within the range of the evidence. Here, the range of the evidence is between 47 and 51 percent, based on Dr. Mody's calculations, between 47 and 51 percent of $30 million or it's $292,000. That's all you've got here. So we can start there. The $5 million the jury reached is not supported by the evidence. Are you familiar with our case in Juicy Quip Inc. versus Orange Bend? That one's not on the top of my list. Okay. Do you have a final thought for us? Yeah, if I could, because I'm going to have to just run through the unit cost statement. No, no, we can't run through things. You're going to have to give me a final thought. We're over time. Okay. Oh, we are over. I'm sorry, I'm reading a minute and a half. Okay. Yeah, if we can go quickly. I just want to summarize the damage issue, because a lot of this is hard to walk through in the small amount of time we have here. We, of course, have the briefs. You're going to have to give me one thought. The thought here is that there is no evidence in this market. This is a stickle case. There is no evidence in this market for a per hit royalty, and that's what these guys got. They got it every time we hit a staple, we're going to pay a license. There is no evidence to support that. Their damage model is based on that, and it's a running royalty. Thank you, Your Honor. Thank you, Ms. Thomas. We will review the record, I promise.